IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN (DUBUQUE) DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 25-CR-1039-CJW |
| | ) | |
| vs. | ) | |
| | ) | |
| AUSTIN ANDREW GOODMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESISTANCE TO DEFENDANT'S MOTION TO DISMISS

Defendant moves to dismiss Count 1 of the Indictment based on the United States Supreme Court's decision in *New York State Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). (Doc. 35.) As explained below, the United States resists and asks the Court to deny the motion.

## TABLE OF CONTENTS

I. BACKGROUND ......................................................................................... 2

II. SECTION 922(g)(4) IS CONSTITUTIONAL UNDER THE SECOND AMENDMENT ........................................................................................... 3

    A. The *Bruen* Decision .............................................................................. 3

        1. *Bruen* and the Second Amendment Standard ....................... 3

        2. The Supreme Court Has Not Cast Doubt on the Disarmament of the Mentally Ill .............................................. 4

    B. The Second Amendment Does Not Protect the Right of Mentally Ill Persons to Bear Arms .................................................... 6

    C. Defendant's As-Applied Challenge Fails ......................................... 15

1

**1.** **Defendant's As-Applied Challenge Requires a Factual Record Developed at Trial** ........................................................ 15

**2.** **Section 922(g)(4) is Constitutional As Applied to Defendant** ................................................................................. 16

**III.** **CONCLUSION** ......................................................................................... 19

## I. BACKGROUND

On September 9, 2025, the grand jury returned an indictment charging defendant with one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(4) and 924(a)(8). (Doc. 3.) The indictment alleges that defendant knowingly possessed a firearm after having been, and knowing he had been, previously committed to a mental institution. (Doc. 3.)

In November 2024, defendant was committed to a mental institution after the Iowa District Court for Dubuque County found by clear and convincing evidence that defendant was seriously mentally impaired. (Doc. 36-1.) The commitment order, citing 18 U.S.C. § 922(g)(4), stated that defendant was prohibited from possessing firearms or ammunition. (Doc. 36-1, at 2.)

The indictment charged an incident on March 3, 2025, where defendant, while live streaming, went to a government building in Dubuque, Iowa, where the Dubuque City Council meeting was underway. Defendant was stopped by police when he exited an elevator and was found to have a loaded gun in his possession. Defendant also had a marijuana cigarette behind his ear and had two dogs on leashes with him in the building.

On December 5, 2025, defendant filed a motion under *Bruen* to dismiss Count 1. (Doc. 35.) In *Bruen*, the Supreme Court concluded that New York's penal code provision that made it a crime to possess a firearm outside the home without a license was unconstitutional. 597 U.S. at 12, 71.

## II. SECTION 922(g)(4) IS CONSTITUTIONAL UNDER THE SECOND AMENDMENT

Defendant asserts both a facial and an as-applied challenge to the charge against him under the Second Amendment based on the *Bruen* decision. The government resists.

### A. The *Bruen* Decision

#### 1. *Bruen and the Second Amendment Standard*

In *Bruen*, the Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to "carry a handgun for self-defense outside the home." 597 U.S. at 9-10. In reaching this conclusion, *Bruen* rejected the "'two-step'" Second Amendment framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-end scrutiny." *Id.* at 17. *Bruen* observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 19. But the Court "decline[d] to adopt" the second step of that framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 17, 19.[1]

_____

[1] The Eighth Circuit had not adopted the two-step framework discussed in *Bruen*. *See United States v. Hughley*, 691 F. App'x 278, 279 n.3 (8th Cir. 2017)

3

*Bruen* thus clarified the "standard for applying the Second Amendment." *Id*. at 24. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. Second, when a regulation infringes such presumptively protected conduct, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. The Court explained that the relevant "metrics" for assessing a regulation's constitutionality are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 29.

### 2. *The Supreme Court Has Not Cast Doubt on the Disarmament of the Mentally Ill*

The Supreme Court has emphasized that its decisions should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *D.C. v. Heller*, 554 U.S. 570, 626 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) ("repeat[ing]" *Heller*'s "assurances" regarding such prohibitions). And in *Bruen*, six Justices took pains to reiterate that certain firearms regulations, including prohibitions on the possession of firearms by felons and the mentally ill, are constitutional. *See Bruen*, 597 U.S. at 72 (Alito, J., concurring) (explaining that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns" (citation omitted)); *Id*. at 81 (Kavanaugh, J.,

---

(noting the Eighth Circuit has "not adopted [the two-step] approach and decline to do so here").

joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are constitutional under *Heller* and *McDonald* (quotation marks omitted)); *Id.* at 129-30 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) (same).

On June 21, 2024, in *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court reaffirmed that "the right secured by the Second Amendment is not unlimited." *Id.* at 1897 (quoting *Heller*, 554 U.S. at 626). In *Rahimi*, the Supreme Court considered a Second Amendment challenge to 18 U.S.C. § 922(g)(8), which, under certain conditions, prohibits an individual subject to a domestic violence restraining order from possessing a firearm. The Supreme Court concluded that "when a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect." *Id.* at 690. In *Rahimi*, the Supreme Court reiterated its commitment that "prohibitions, like those on the possession of firearms by 'felons and the mentally ill' are 'presumptively lawful.'" *Id.* at 699 (quoting *Heller*, 554 U.S. at 626, 627, n.26).

The Eighth Circuit has repeated these assurances in affirming the dispossession of the other class of individuals referenced in them, felons. *See United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024) ("The decision in *Bruen*, which reaffirmed that the right is 'subject to certain reasonable, well-defined restrictions,' did not disturb those statements or cast doubt on the prohibitions."

5

(internal citation omitted)). "Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Id.* at 1128. "This history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.*

### B. The Second Amendment Does Not Protect the Right of Mentally Ill Persons to Bear Arms

To determine whether a statute comports with the Second Amendment, courts look to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting firearm possession by those who have been previously committed to a mental institution.

In determining the scope of the "right to keep and bear arms," the Supreme Court has recognized that the Second Amendment does not guarantee an unlimited right to possess any weapon; rather, Congress may ban certain categories of "dangerous and unusual weapons." *Heller*, 554 U.S. at 627. Nor does the Second Amendment guarantee an unlimited right to carry protected weapons in all locations. *Bruen*, 597 U.S. at 30 (explaining that Congress may ban weapons in "sensitive places").

In a similar vein, categorical bans on the possession of firearms by specific groups are compatible with the Second Amendment. "Legislatures historically prohibited possession by categories of persons based on a conclusion that the

category as a whole presented an unacceptable risk of danger if armed." *Jackson*, 110 F.4th at 1128.

The United States has a longstanding tradition, dating to colonial times and continuing to the present, of disarming those who pose a danger to themselves or others. In exercising this authority, legislatures have frequently made categorical judgments, rather than proceed through individualized case-by-case analysis.

One category of individuals who lack the right to bear arms are the mentally ill. In *Heller* itself, the Supreme Court stated that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." 554 U.S. at 626. The plurality opinion in *McDonald* "repeat[ed] those assurances." *McDonald*, 561 U.S. at 786. Most recently, in *Bruen*, two concurring justices reiterated that understanding, pointing out that nothing in *Bruen* was meant to cast doubt on "objective shall-issue licensing regimes" that "may require a license applicant to undergo . . . a mental health records check." *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring).

"[H]istorical evidence supports the view that society did not trust the mentally ill with the responsibility of bearing arms." *Mai v. United States*, 952 F.3d 1106, 1114 (9th Cir. 2020). For example, in England, the Vagrancy Act of 1744 allowed justices of the peace to lock up and seize the property of those "who by Lunacy . . . are furiously mad, or are so far disordered in their Senses that they may be dangerous." 17 Geo. 2, c. 5 (capitalization altered); Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield (1800)*,

19 Law & Soc'y Rev. 487, 509-510 (1985).  A "lunatic" could include a person who "hath lucid intervals; sometimes enjoying his senses, and sometimes not."  1 William Blackstone, Commentaries on the Laws of England 294 (1765); *see also* Edward Coke, *The First Part of the Institutes of the Lawes of England, or, a Commentarie upon Littleton* § 405, at 247 (1628).

Likewise, in pre-Founding and Founding-era America, those who had become affected with mental illnesses "were generally treated as if they had been . . . [s]tripped of all . . . their rights and privileges."  Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* 41 (1949).  Some colonies authorized justices of the peace to "lock[ ] up" lunatics considered "dangerous to be permitted to go abroad."  Henry Care, *English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed. 1774).  "It should come as no surprise that confinement did not include access to guns."  *United States v. Veasley*, 98 F.4th 906, 913 (8th Cir. 2024).

Around the time of the Second Amendment's ratification, several states had enacted laws—tracking the English Vagrancy Act—that permitted the commitment of persons determined by justices of the peace, magistrates, or selectmen to be "[l]unatics" or of "unsound mind."  *See, e.g.*, 1769 Va. Act 13; 2 William Littell, *The Statute Law of Kentucky* 578 (1810) (referencing statute of 1787); 1 Samuel Shepherd, *Statutes at Large of Virginia from October Session 1792, to December Session 1806, Inclusive* 163 (1835) (1792 law); 1798 Mass. Act 813; 1 *The Public Statute Laws of the State of Connecticut* 386 (1808) (1793 law).  Governing officials

under these and other provisions had "a lot of discretion when deciding whether to confine the mentally ill." *Veasley*, 98 F.4th at 914.

To be sure, non-penal institutions designed specifically to house the ill, let alone the mentally ill, rarely existed at the Founding. *Id.* But this was due to social and technological factors, and it does not suggest that limitations on firearm possession by the mentally ill were understood to violate the right to bear arms. The first general hospital in colonial America did not open until the 1750's, while the first asylum dedicated to the care of the mentally ill opened in Williamsburg in 1773. Deutsch, *supra*, at 58-60; Grob, *infra*, at 18-20.

Colonial America "lacked large urban areas and complex institutional arrangements characteristic of" England. Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 5, 13-14 (1994). Some areas lacked even "the luxury of a jail." Deutsch, *supra*, at 41. Because the "proportionately small number of 'distracted' persons did not warrant the creation of special facilities," persons with mental illness initially "were cared for on an ad hoc and informal basis." Grob, *supra*, at 6. Given these societal conditions, early "legislation usually concerned itself more with [the mentally ill person's] property than their person." Deutsch, *supra*, at 53; *see also* Mary Ann Jimenez, *Changing Faces of Madness: Early American Attitudes and Treatment of the Insane* 51 (1987). It was not until the nineteenth century that a "dramatic growth in population" caused mentally ill persons to be "more visible, and public concern about security increased." Grob, *supra*, at 24.

9

As relevant societal conditions changed, so did the nature and specificity of mental-illness related firearms regulations. As the nineteenth century progressed, several states banned the sale of guns to the mentally ill. *See* 1881 Fla. Laws 87; 1883 Kan. Sess. Laws 159; 1899 N.C. Pub. Laws 202-1; *see also* Sam Kimble, *Revised Ordinances of the City of Manhattan and Rules of the Council* 49 (1887). In the twentieth century, more regulations restricting the delivery or sale of firearms were extended to the mentally ill. *See, e.g.*, 1927 N.J. Laws 745; 1931 Pa. Laws 499; 1935 Ind. Act 161; 1935 S.D. Sess. Laws 356; 1935 Wash. Sess. Laws 601; 1936 Ala. Acts 52; 47 Stat. 650, 652 (1932). Given this entire body of American law, "longstanding prohibitions on the possession of firearms" by the mentally ill have a well-established "historical tradition." *Heller*, 554 U.S. at 626-627; *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring).

Because categorical prohibitions and prohibitions on firearm possession by the mentally ill are consistent with the Second Amendment, 18 U.S.C. § 922(g)(4) is constitutional. Congress could reasonably conclude that persons who have been involuntarily committed to mental institutions are more likely than ordinary citizens to pose a risk of misusing firearms. The principal purpose of the Gun Control Act, which enacted Section 922(g)(4), was to "c[ur]b crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (quoting S. Rep. No. 90-1501, at 22, *available at* 1968 U.S.C.C.A.N. 4410). More recently, in passing amendments to this scheme, Congress has reiterated

10

findings that shootings, including mass shootings, have been committed by persons with a history of mental illness.  NICS Improvement Amendment Act of 2007, Pub. L. No. 110-180, § 2(8)-(9), 121 Stat. 2559-2560.

"[S]cientific evidence amply supports that congressional judgment."  *Mai*, 952 F.3d at 1117.  Individuals released from involuntary commitment present "an increased risk of violence" and are 39 times more likely than other people to commit suicide.  *Id.*  "Scientific studies show an ever-present increased risk of violence for those who were committed involuntarily, even well after they are released."  *Id.* at 1118.

Section 922(g)(4) is consistent with these principles.  Courts commit individuals to mental institutions because they pose a danger to themselves or others.  *See United States v. Gould*, 672 F. Supp. 3d 167, 180-81 (S.D.W. Va. 2023) ("[A] defendant who is committed to a mental institution by a court because he poses a danger to himself or others, which is a criterion for commitment in nearly every state, qualifies both under the first prong of 'committed to a mental institution' and as being adjudicated as a 'mental defective.'" (footnotes omitted)) (affirmed in *United States v. Gould*, 146 F.4th 421 (4th Cir. 2025)).  The data suggests only a small subset of people with serious mental illness are involuntarily committed each year.  Alexandra T. Cline, *Who Has the Right?: Analysis of Second Amendment Challenges to 18 U.S.C. § 922(g)(4)*, 96 Notre Dame L. Rev. 1623, 1626-1627 (2021).  Moreover, the Constitution prohibits involuntary commitment of any "nondangerous individual who is capable of surviving safely in freedom" with

Case 2:25-cr-01039-CJW-MAR     Document 41     Filed 12/12/25     Page 11 of 20

or without the assistance of family and friends. *O'Connor v. Donaldson*, 422 U.S. 563, 575-576 (1975). Congress could reasonably find that persons who at one time presented a danger sufficient to warrant involuntary commitment under current due process standards should have restricted access to machinery that can be used to perpetrate dangerous violent acts.

The Supreme Court's decision in *Rahimi* reinforces the conclusion that defendant may be constitutionally disarmed. "[T]he Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." 602 U.S. at 693; *see also Id.* at 699 (concluding early laws showed legislatures can introduce bans after "judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon").

Applying this principle, the Supreme Court found no Second Amendment issue with barring gun possession by the defendant in *Rahimi*, who had been "found by a court to present a threat to others." *Id.* at 698. Based on that finding, the defendant "fit[ ] neatly within the tradition" represented by various laws from around the time of the Second Amendment's enactment, such as surety statutes and laws against going armed to the terror of the people. *Id.*

Like Section 922(g)(8), Section 922(g)(4) "restricts gun use to mitigate demonstrated threats of physical violence" and "does not broadly restrict arms use by the public generally." *See Rahimi*, 602 U.S. at 698. Defendants who have

12

been committed to mental institutions have been found to present a threat to others and thus "fit[ ] neatly within the tradition" of disarmament. *See Id.*

Section 922(g)(4)'s application to individuals released from involuntary commitments that occurred years in the past does not render the statute unconstitutional. *Heller* indicated that the Second Amendment permits categorical bans on firearms possession by the "mentally ill." *Heller*, 554 U.S. at 626. The fact of a person's prior commitment, which must be grounded in a finding of dangerousness, presumptively establishes a sufficient risk of future danger and firearms irresponsibility to support disarmament. *See Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 116 (1983) (observing that Congress in Section 922(g)(4) "made no exception for subsequent curative events" and that "Congress obviously felt that" a person who "may be deemed cured and released" was nevertheless "too much of a risk to be allowed firearms privileges"). Nor is there evidence that mentally ill persons released today would have been released in early America. *Cf. United States v. Perez-Garcia*, 96 F.4th 1166, 1184 (9th Cir. 2024) (finding ban on firearm possession by those on federal pretrial release permissible as such individuals likely would not have been released to bail in the founding era); *Veasley*, 98 F.4th at 915 (noting "heavy handed" treatment of the mentally ill, who had limited "chance to regain their rights").

Since the *Bruen* decision, district courts, including this one, have repeatedly rejected Second Amendment challenges to Section 922(g)(4). *See United States v. Clark*, No. 24-cr-2056-CJW-MAR (N. Iowa April 8, 2025); *United States v. Franzky*,

13

No. 4:23-CR-40022, 2024 WL 4494988, at *4 (D. S.D. Oct. 15, 2024) (holding that 18 U.S.C. § 922(g)(4) is facially constitutional and constitutional as applied to the defendant in that case); *United States v. Laykovich*, No. 5:24-CR-35-KKC-EBA, 2024 WL 4376265, at *4 (E.D. Ky. Oct. 2, 2024) (holding that 18 U.S.C. § 922(g)(4) is facially constitutional); *United States v. Walker*, 747 F. Supp. 3d 1195, 1202 (D. Minn. 2024) (same); *United States v. Weathers*, No. 4:23-CR-00031-WMR, 2024 WL 2864678, at *1 (N.D. Ga. June 6, 2024) (denying motion to dismiss and adopting report and recommendation determination that 18 U.S.C. § 922(g)(4) is facially constitutional); *United States v. Gould*, 672 F. Supp. 3d 167, 184 (S.D. W.Va. 2023) (holding that 18 U.S.C. § 922(g)(4) is facially constitutional); *but see United States v. Rose*, 1:23-CR-00034-HAP-SLC (N.D. Ind. Dec. 20, 2023) (holding that Section 922(g)(4) was unconstitutional as applied to defendant whose commitment was more than a decade prior and who had been denied process for reinstatement).

In support of his motion, defendant cites *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678 (6th Cir. 2016), a pre-*Bruen* declaratory judgment action examining whether the defendant's lawsuit survived a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Id.* at 681. The defendant in that case had a prior mental health commitment and lived in a state without a process by which he could have his firearms rights restored. *Id.* at 681-84. *Tyler* is inapposite. It predates the Supreme Court's rulings in *Bruen* and *Rahimi* and cannot provide any guidance on applying the principles outlined by the Court in those cases. Additionally, unlike the defendant in *Tyler*, defendant lives in Iowa, a state with

14

a process for seeking to lift the bar imposed by Section 922(g)(4) as further discussed below.

Congress may, consistent with the Second Amendment, categorically disarm all individuals who have been found by a court (or other neutral arbiter) to be mentally ill. Additionally, history instructs that the statute (and other firearms restrictions in 18 U.S.C. § 922(g)) is not susceptible to as-applied challenges. "Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger." *Jackson*, 110 F.4th at 1128. "This history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.* Congress was entitled to conclude that persons previously committed to mental health institutions or otherwise subject to the bar in Section 922(g)(4) posed just such an unacceptable risk.

### C. Defendant's As-Applied Challenge Fails

#### 1. Defendant's As-Applied Challenge Requires a Factual Record Developed at Trial

The Court should not consider defendant's as-applied challenge in the absence of a trial. *See Clark*, No. 24-cr-2056-CJW-MAR (N. Iowa April 8, 2025) at 6. In *United States v. Turner*, 842 F.3d 602 (8th Cir. 2016), which involved a vagueness challenge to 18 U.S.C. § 922(g)(3), the court held that the defendant's as-applied challenge should "not be ruled upon without a 'trial on the merits.'" *Id.* at 604-05 (citing *United States v. Covington*, 395 U.S. 57, 60 (1969); Fed. R. Crim. P. 12(b)(1)). In *United States v. Baxter*, 127 F.4th 1087 (8th Cir. 2025), which

involved a Second Amendment as-applied challenge to 18 U.S.C. § 922(g)(3), the Eighth Circuit remanded for the district court to make factual findings due to an "underdeveloped record." *Id.* at 1091 (quoting *United States v. Bloomfield*, 40 F.3d 910, 922 (8th Cir. 1994) (en banc) (McMillian, J., dissenting)).

Both *Turner* and *Baxter* involved challenges to Section 922(g)(3) rather than Section 922(g)(4). Nevertheless, the Court should similarly hold defendant's as-applied challenge in abeyance pending trial in this matter. To support his as-applied challenge, defendant inappropriately relies on facts from the pretrial services report prepared by the United States Probation Office. (Doc. 35-1, at 10; Doc. 15.) But "information obtained in the course of performing pretrial services functions in relation to a particular accused shall be used only for the purposes of a bail determination." 18 U.S.C. § 3153(c). At trial, the government will be able to present additional facts regarding defendant's mental health and his offense conduct.

### 2. Section 922(g)(4) is Constitutional As Applied to Defendant

For the reasons above, a ruling on defendant's as-applied challenge requires a trial. However, when the Court considers defendant's as-applied challenge, the Court should find that the statute is constitutional as applied to defendant.

Defendant lives in Iowa, which has a qualifying relief-from-disability program. In other contexts, the Supreme Court has recognized that the Constitution itself provides no remedy when an adequate state remedy exists. *See generally Parratt v. Taylor*, 451 U.S. 527, 535-543 (1981) (holding that a state actor's negligent

deprivation of property does not violate the Due Process Clause if the state provides an adequate alternative remedy).  Iowa, like over 30 other states, has accepted a congressional invitation to establish a procedure to lift the disqualification Section 922(g)(4) imposes.  *See* 34 U.S.C. § 40915(a)(2).  In such a scheme, a state agency or state court must consider whether a person is no longer "likely to act in a manner dangerous to public safety."  *Id.*  If a state grants "an application for relief," then "the adjudication or commitment . . . is deemed not to have occurred for purposes of subsection[ ] (g)(4)."  34 U.S.C. § 40915(b).  The state court or agency must adjudicate any application for relief "in accordance with the principles of due process," and the applicant must have a right to "de novo judicial review."  34 U.S.C. § 40915(a)(2)-(3).

Here, the law provided defendant an opportunity to show that he was no longer likely to act dangerously.  Iowa has enacted a qualified scheme compliant with 34 U.S.C. § 40915.  Iowa Code § 724.31(2) provides that:

> A person who is subject to the disabilities imposed by 18 U.S.C. § 922(d)(4) and (g)(4) because of an order or judgment that occurred under the laws of this state may petition the court that issued the order or judgment or the court in the county where the person resides for relief from the disabilities imposed under 18 U.S.C. § 922(d)(4) and (g)(4).

After the petition is filed,

> The court shall receive and consider evidence in a closed proceeding, including evidence offered by the petitioner, concerning all of the following:
>
> a. The circumstances surrounding the original issuance of the order or judgment that resulted in the firearm disabilities imposed by 18 U.S.C. § 922(d)(4) and (g)(4).

17

b.  The petitioner's record, which shall include, at a minimum, the petitioner's mental health records and criminal history records, if any.

c.  The petitioner's reputation, developed, at a minimum, through character witness statements, testimony, and other character evidence.

d.  Any changes in the petitioner's condition or circumstances since the issuance of the original order or judgment that are relevant to the relief sought.

Iowa Code § 724.31(3).  The court must grant the petition for relief "if the court finds by a preponderance of the evidence that the petitioner will not be likely to act in a manner dangerous to the public safety and that the granting of the relief would not be contrary to the public interest."  Iowa Code § 724.31(4).  A "petitioner may appeal a denial of the requested relief, and review on appeal shall be de novo."  Iowa Code § 724.31(4).  Thus, in Iowa, Section 922(g)(4) applies only to individuals with qualifying commitments who have been unable to establish that they no longer present a danger to the public or to themselves.  *See United States v. Johnson,* No. CR15-3035-MWB, 2016 WL 614727, at *6 (N.D. Iowa Feb. 16, 2016) (concluding, pre-*Bruen*, that Section 922(g)(4) was constitutional as applied to the defendant because Iowa Code § 724.31 mitigated Section 922(g)(4)'s burden on his Second Amendment Rights and the defendant had had more than four years to seek relief under Iowa Code § 724.31 and had not done so); *see also United States v. Laykovich,* No. 5:24-CR-35-KKC-EBA, 2024 WL 4376265, at *4 (E.D. Ky. Oct. 2, 2024) ("This deprivation of Second Amendment rights is, in fact, temporary. . . . an individual subject to the prohibitions of § 922(g)(4) may obtain relief by completing a state-run relief from disabilities program." (citing 34 U.S.C. § 40915(a))).  The Second Amendment permits Congress to bar firearm possession by one who has been

previously found dangerously mentally ill and has not secured available state court relief from that finding.

Defendant's reliance on *United States v. Cooper*, 127 F.4th 1092 (8th Cir. 2025) is misplaced. *Cooper* involved an as-applied challenge to Section 922(g)(3) by an unlawful user of a controlled substance. *Id.* at 1094. The Eighth Circuit noted that it had no assurances from the Supreme Court about the constitutionality of a categorical ban on the possession of firearms by drug users and addicts. *Id.* at 1097. In contrast, the Supreme Court has repeatedly provided these assurances when it comes to the mentally ill. *See Rahimi*, 602 U.S. at 699; *Bruen*, 597 U.S. at 72, 81; *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786. In *Jackson*, the Eighth Circuit concluded, based in part on the Court's similar assurances regarding felons, that the Second Amendment is constitutional as applied to felons and "there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." *Jackson*, 110 F.4th at 1128. "Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Id.* at 1128. The mentally ill are such a category of persons, as the Supreme Court has recognized. Accordingly, *Jackson*, not *Cooper*, applies to as-applied challenges to Section 922(g)(4).

## III. CONCLUSION

For the reasons above, the Court should deny defendant's motion to dismiss Count 1 of the Indictment.

Respectfully submitted,

CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2025,
I electronically filed the foregoing with the
Clerk of Court using the ECF system, which
will send notification of such filing to the
parties or attorneys of record.

UNITED STATES ATTORNEY

BY: /s/ RAL

LEIF OLSON
United States Attorney


By: */s/ Emily K. Nydle*

EMILY K. NYDLE
Assistant United States Attorney
111 7th Avenue SE, Box 1
Cedar Rapids, Iowa 52401
(319) 363-6333
(319) 363-1990 – Fax
Emily.Nydle@usdoj.gov