**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>vs.<br><br>AUSTIN ANDREW GOODMAN,<br>Defendant. | Case No. 25-cr-1039-CJW<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS AND MOTION TO SUPPRESS** |

_____

**TABLE OF CONTENTS**

Page

*I.*     *INTRODUCTION*..............................................................................2

*II.*    *THE DECEMBER 29, 2025 HEARING* ...............................................3

*III.*   *FINDINGS OF FACT*........................................................................4

*IV.*    *THE MOTION TO DISMISS* ............................................................12

      *A.*     *The Parties' Arguments* .........................................................12

      *B.*     *Analysis*..............................................................................13

*V.*     *THE MOTION TO SUPPRESS*.........................................................17

      *A.*     *Stipulation*...........................................................................17

      *B.*     *The Parties' Arguments* .........................................................18

      *C.*     *Relevant Law* .......................................................................19

      *D.*     *Analysis*..............................................................................23

      *1.*     *Was there probable cause for the first warrant to seize Defendant's phone?* ...................................................**23**

      *2.*     *Was there probable cause for the second warrant to search Defendant's home for electronic devices?* ..................**29**

      *3.*     *Was there probable cause for the third warrant (i.e., to search Defendant's home for controlled substances, paraphernalia, firearms, and ammunition)?* .........**30**

      *4.*     *Was there probable cause for the fourth warrant (i.e., to search Defendant's electronic devices)?* .............................**31**

      *5.*     *Is the* **Leon** *good faith exception applicable?* ........................**31**

*VI.*    *CONCLUSION* .................................................................**33**

## I.  INTRODUCTION

On September 9, 2025, the Grand Jury returned an Indictment charging Defendant with one count of Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. Sections 922(g)(4) and 924(a)(8).  (Doc. 3.)

The matters before me are Defendant's Motion to Dismiss (Doc. 35) and Defendant's Motion to Suppress.  (Doc. 39.)  Attached to the suppression motion is Defendant's Inventory (Dubuque Police Department Property and Evidence Voucher) of items to be suppressed which includes: any evidence derived from the seizure of Defendant's Apple iPhone and Lenovo ThinkPad, the extraction of those devices' data and content, and the review of that data; and any evidence derived from the search of Defendant's person and residence, but not limited to, an Apple iPhone, the Lenovo ThinkPad, firearms, magazines, ammunition, documents related to firearms and ammunition, controlled substances, paraphernalia, photographs taken by police, and observations of officers.  (Docs. 39-1 at 13, 39-2.)  The Government filed a timely

2

Resistances to Defendant's Motion to Dismiss (Doc. 41) and Motion to Suppress (Doc. 42). The Honorable C.J. Williams, Chief United States District Court Judge, referred the motions to me for a Report and Recommendation.

The Motion to Dismiss takes issue with the constitutionality of 18 U.S.C. Section 922(4) which prohibits possession of a firearm by a person "who has been adjudicated as a mental defective or who has been committed to a mental institution." The Motion to Suppress challenges certain warrants authorizing the search of his residence.[1]

## II.    THE DECEMBER 29, 2025 HEARING

I held a hearing on Defendant's motions on December 29, 2025. (Doc. 43.) At the hearing, the following Government's suppression exhibits were admitted without objection:

1.    Application for Search Warrant (person of Austin Goodman);

1A. Search Warrant (person of Austin Goodman);

2.   Application for Search Warrant (residence; electronic devices);

2A. Search Warrant (residence; electronic devices);

3.   Application for Search Warrant (residence; drugs, firearms and ammunition);

3A. Search Warrant (residence; drugs, firearms and ammunition);

4.  Application for Search Warrant (Lenovo ThinkPad and Silver Apple iPhone); and

4A. Search Warrant (ThinkPad and Silver Apple iPhone).

At the hearing, the following Defendant's Motion to Dismiss exhibits were admitted without objection:

A.  Austin Goodman Involuntary Commitment Order; and

---

[1] At the hearing, the parties confirmed that parts of Defendant's suppression motion have been rendered moot by the Government's agreement not to offer at trial evidence relating to seized electronic devices, as discussed below.

B.  Austin Goodman Physician's Report of Examination.

The following Defendant's suppression exhibits were also admitted without objection:

A.  Dubuque County Sheriff's Office Incident/Investigation Report;

B.  Application for Search Warrant (person of Austin Goodman);

B1. Search Warrant (person of Austin Goodman);

C.  Application for Search Warrant (residence; electronic devices);

C1. Search Warrant (residence; electronic devices);

D.  Application for Search Warrant (residence; drugs, firearms and ammunition);

D1. Search Warrant (residence; drugs, firearms and ammunition);

E.  Application for Search Warrant (Lenovo ThinkPad and Silver Apple iPhone);

E1. Search Warrant (Lenovo ThinkPad and Silver Apple iPhone).

The Government called Dubuque Police Officer Nick Schlosser[2] as a witness.  I found the witness credible.

For the following reasons, I respectfully recommend that the District Court **deny both** Defendant's Motion to Dismiss and Defendant's Motion to Suppress.

### III.    FINDINGS OF FACT

The indictment, and Defendant's motion to dismiss it, arise from events on March 3, 2025 when Defendant was arrested in the Dubuque, Iowa Federal Building[3] while in possession of a firearm.  The facts pertaining to the March 3, 2025 incident, while dramatic, are at least straight forward.  The facts underlying the motion to suppress that

---

[2] Officer Schlosser has been employed by the Dubuque Police Department for more than 21 years.  He graduated from the Iowa Law Enforcement Academy in 2004.  He is currently assigned to the Criminal Investigations Division and is part of the ATF Task Force.

[3] The Historic Building was once a United States Post Office and Courthouse but now houses the City of Dubuque City Council Chambers. (Schlosser H'rg Test. at 16; https://www.cityofdubuque.org/1555/Historic-Federal-Building.)

4

transpired the previous fall, on the other hand, are much more complicated. Because the sufficiency of the probable cause in a warrant must be determined by the content of the supporting affidavit, it may be best to start with the facts as presented by the warrants in question.

But first, a précis: Officer Schlosser was investigating alleged harassment by Defendant directed toward his former employer, C.M. Ultimately, Officer Schlosser obtained four warrants from two judges in Dubuque County to (1) seize Defendant's cell phone from his person (Gov't Ex. 1); (2) to search Defendant's residence for "[a]ny electronic devices that can communicate via cell service or internet and or Wi-Fi" (Gov't Ex 2); (3) to search Defendant's residence for evidence relating to controlled substances, firearms, and ammunition (Gov't Ex. 3); and (4) to search the contents of Defendant's cell phone and Lenovo Thinkpad that had been seized pursuant to warrants 1 and 2. (Gov't Ex. 4.)

Officer Schlosser's "Affiant's Attachment" supporting the warrants to seize Defendant's phone, initially search his apartment for electronic devices, and to later search the devices (i.e., Exhibits 1, 3, and 4) contains the following identical statements:

> On 10/28/2024 at approximately 1034 hours Officer Barbour, responded to the DLEC[4] to meet with [C.M.] [DOB and address]
>
> [C.M.] advised he has been dealing with ongoing harassment with Austin Andrew Goodman [DPN] of [XXXX] Melrose Ter. over the last month. [C.M.] advised Goodman use [sic] to work for his business up until about 09/10/2024 when he was fired.[5]
>
> [C.M.] found out recently Goodman created a letter regarding a lawsuit attacking [C.M.] and his business. [C.M.] advised on 10/26/2024 and

---

[4] I believe DLEC stands for Dubuque Law Enforcement Center. It is reasonable to infer this facility is known to judges in Dubuque.

[5] Officer Schlosser testified that Defendant was "heavily involved in technology" related to his work for C.M. (Schlosser Hr'g Test. at 40-41.) This statement does not appear in the affidavit.

10/27/2024 Goodman went on a spree giving people these letters. [C.M.] advised he has had Goodman trespassed[6] from several of his properties due to the harassment that has been on going. Officer Barbour located 9 different properties [C.M.] had Goodman trespassed from. [C.M.] advised he found many of these letters from Goodman at the properties he has trespassed from. [C.M.] is unsure if he physically dropped these off or how they were delivered. [C.M.] advised he found a copy of a letter on the business floors of XXX Main St. and YYY Main St. The doors were locked over the weekend so he would have slid it through the door.[7] [C.M.] advised his wife has a property at ZZZ W. 3rd St., (which Goodman is trespassed from) found a letter on the floor as well. [C.M.] advised he found approximately 50 copies of this letter on his printer at YYY Main St. [C.M.] believes Goodman got into the Wi-Fi and accessed the printer.

[C.M.] is afraid because he knows Goodman owns firearms, uses drugs and is not mentally stable.

[C.M.] advised on 10/28/2024 at approximately 0900 hours he got to his business at XXX Main St. [C.M.] heard from his employees working outside that Goodman drove by and yelled "Fuck Chris [C.M.]." [C.M.] advised Goodman drives a black Jeep Cherokee.

[C.M.] also showed Barbour a text Goodman sent to [D.L.] who owns [a local business]. The text says, "[C.M.] is going to have to deal with the consequences of his actions." Goodman talks about [C.M.] making millions from a deal Goodman allegedly got him. [D.L.] asked Goodman "Whats the goal? Settlement or burn it down?" Goodman responded with fire emojis and money bag emojis. Then states "House on fire" and "I expect a settlement, but that's not what it's about."

---

[6] Officer Schlosser testified at the hearing that having someone "trespassed" means the person has been formally notified that their presence on the property could subject them to prosecution for trespassing. (Schlosser H'rg Test. at 42.)

[7] Officer Schlosser testified, "C.M. wasn't sure if he—the buildings were locked, so he wasn't sure—he didn't believe Goodman may have entered them but may have slid them under the doors." (Schlosser H'rg Test. at 20.)

[C.M.] also showed a Facebook post[8] by Goodman that he advised is directed at him. It states, "You forced the hand, now you can deal with the consequences." [C.M.] advised there is [sic] several posts directed at him. [C.M.] also sent me a letter from a "[S.C.]" that she wrote. The letter states she does not want to be involved in the case. The letter talks about Goodman stating he wants to "destroy [C.M.]" and that he will "Own everything when it's over."

Officer Barbour later spoke with [C.M.]'s IT person, [J.O. DOB)]. J.O. advised he works for [technology business] at[address]. J.O. advised he was informed about the printer incident by [C.M.], so he looked up who logged onto the network. [J.O.] observed a new laptop was added to the network on 10/27/2024 at 1817 hours and disconnected at 1824 hours. [J.O.] advised an Iphone 15 also connected to the network at the same time. [J.O.] advised the same Iphone connected on 10/12/2024 at approximately 1213 hours. [J.O.] advised Goodman's access to the network was revoked. However, he has knowledge on how to get onto the wifi since it has not been changed which enables him to access the printer. [J.O.] sent me photos of the devices connected.

Officer Barbour later reviewed traffic camera footage. Officer Barbour observed on 10/28/2024 at approximately 0907 hours a black Jeep Grand Cherokee bearing IA plates [AAAAAA] registered to Goodman driving south on Main St. near [XXX] Main St. Officer Barbour observed workers working outside and his vehicle stopped near them. He goes around the town clock and drives away.

On 10/27/2024 at approximately 1816 hours Goodman's vehicle arrives at [YYY] Main St. and parks in front of it briefly. Goodman then drives east on 8th St. and parks near Iowa St. He gets out of his car and walks towards the parking ramp, but Officer Barbour cannot tell what he is doing. He gets back in his car and pulls onto Iowa St. He walks over to the DLEC. He later walks back to his car and drives away at approximately 1822 hours.

---

[8] At the hearing, Officer Schlosser confirmed this was a public facing post and not a direct message to C.M. (Schlosser H'rg Test. at 35-36.)

The warrant to search for evidence of controlled substances, firearms, and ammunition was a piggyback warrant[9] that followed the initial search of Defendant's residence. Thus, Officer Schlosser's Affiant's Attachment for Exhibit 3 includes all the foregoing quoted text as well as the following additional statement:

> On 10/31/2024 Dubuque Police were executing a search warrant at Goodman's residence. When police entered the residence, they could detect an odor of marijuana. Upon initial search of the residence, located in plain view was marijuana, firearms, and drug paraphernalia.

In addition to the facts shown in Officer Schlosser's affidavits, he testified at the hearing regarding, *inter alia*, (1) the investigation of the alleged harassment of C.M., (2) drafting, obtaining, and executing the various warrants; (3) Defendant's involuntary commitment; and (4) the March 2025 incident at the Federal Building. I will address this additional factual background, bearing in mind that whether the affidavits demonstrate probable cause is to be determined from the four corners of the affidavit and not what else Officer Schlosser might have known or later learned. Nevertheless, these facts bear on the motion to dismiss, and to some extent, on the application of the *Leon* good faith doctrine.

Officer Schlosser testified he had written "several" warrants which he later stated meant "well over a hundred." (Schlosser Hr'g Test. at 7, 40). Officer Schlosser

---

[9] "Piggyback warrant" refers to a supplemental warrant that is obtained to seize unanticipated contraband or evidence after a warranted search for other evidence discloses the contraband or evidence. *See e.g., United States v. Vailes*, No. 2:22-cr-00104-JAD-BNW, 2023 WL 5347134, at *1 (D. Nev. Aug. 21, 2023) ("[G]uns and drugs were found during a search of [the defendant's] home and car that was initially authorized by a search warrant seeking evidence of pandering based on the testimony of an undercover detective to whom [the defendant] offered his pimp services. After discovering the guns and drugs, the officers obtained a 'piggyback warrant' and seized them.").

explained how after he completed a "complaint" and affidavit, he would have it notarized, reviewed by a shift commander, present it to a county attorney, and, if approved, appear before an available judge. (*Id.* at 8.) He described how he incorporates any changes suggested by the shift commander or county attorney. (*Id.* at 24.) From the time the warrant is drafted until it is presented to a judge varies depending upon the complexity of the case, but it takes 45 minutes on average. (*Id.* at 25.) Officer Schlosser estimated it took approximately 20 minutes from his arrival at the hospital until he left with the phone. (*Id.* at 26-27.)

Officer Schlosser testified that although C.M.'s IT person identified an iPhone as having connected to the network, as stated in the affidavit, the warrant applied to Defendant's "cell phone," because law enforcement did not yet know what kind of cell phone Defendant had. (*Id.* at 34.)[10] After the first warrant was executed, Officer Schlosser went through the same process to obtain a warrant to search Defendant's residence. (*Id.* at 28-29.)

Officer Schlosser testified that Judge Richter, who signed the first three requested warrants (Ex. 1A, 2A, and 3A) and Judge Hostager, who signed the fourth warrant (Ex. 4A) were former Assistant County Attorneys. Each judge happened to be available when the warrants were presented. (*Id.* at 30.) Officer Schlosser testified that the judges in Dubuque County are "very thorough, especially when it comes to electronic devices." He further explained that the judges were "strict on dates" so the warrants would not be open ended and about the warrants' "content" showing probable cause. (*Id.* at 9, 10, 32.) Officer Schlosser has not had a warrant rejected, although he has been asked to add or modify warrants before they were signed. (*Id.* at 9.) The "custom" in Dubuque

---

[10] The record does not disclose whether Officer Schlosser or anyone else considered the possibility of seizing only an iPhone, if Defendant possessed one. Even if the Defendant has a point that the warrant is slightly broader than necessary on this issue, it is mooted by the fact that the cell phone (iPhone or otherwise) was never searched.

County, Officer Schlosser testified, is that a warrant to seize a phone would be followed by a separate warrant to search it. (*Id.* at 10.) Officer Schlosser authored the warrants shown in Exhibits 1-4.

Regarding the investigation of Defendant, Officer Schlosser testified that the Dubuque Police Chief requested the Criminal Investigations Division assist patrol with a harassment investigation where Defendant was the subject. Moreover, the Dubuque City Attorney was drafting a cease-and-desist letter for police to serve. (*Id.* at 11.)

Officer Schlosser spoke to Officer Barbour whose investigation was used to draft the warrant to seize Defendant's cell phone. (*Id.* at 12.) Officer Schlosser learned that Defendant "had just currently been committed to Mercy Hospital." Officer Schlosser testified that the warrant was executed at Mercy Hospital where officers obtained Defendant's phone. (*Id.*) The warrant return reflects that a "silver apple iPhone in a tinted case" was seized at 250 Mercy Drive on October 31, 2024.[11]

After Officer Schlosser left the hospital, he obtained a warrant to search Defendant's residence using the same information. (Gov't Ex. 2, 2A; Schlosser Hr'g Test. at 13.) When officers were clearing the residence "to make sure nobody else" was present, officers noticed a glass pipe, some marijuana and some firearms. (Schlosser Hr'g Test. at 13.) Law enforcement stopped the search and applied for a new warrant. (*Id.*; Gov't Ex. 3.) After obtaining the warrant, Officer Schlosser called officers on the scene and advised them he was on his way with the signed warrant in hand. (Schlosser

---

[11] Defendant's Exhibit A states that Defendant was taken into custody in the Dubuque County Courthouse on October 31, 2024 and was transported to Mercy One ER per a "court ordered commitment for mental health and substance abuse." (Doc. 39-3 at 3.) The commitment order and physician's exam are dated November 4, 2004. (Doc. 36-1 and 36-2.) Regardless of when Defendant was formally committed, I see no reason to doubt that Defendant was at Mercy Hospital when the iPhone warrant was executed.

H'rg Test. at 14.) When he arrived back at the residence, officers were collecting those items. (*Id.*)

While the warrant for the search of the iPhone and ThinkPad may, in a sense, be moot, some of the details surrounding it may bear on the *Leon* issue. Officer Schlosser testified that that he had requested a fellow officer provide him a template for a warrant used to search cell phones. Officer Schlosser copied and pasted part of the contents of Exhibit 4 that included details of an unrelated death investigation from that template. Judge Hostager noted those details in what he believed were two errors in lines 3 (a)-(b) of Exhibit 4, and asked Officer Schlosser to cross them out, initial them, and date them. (*Id.* at 19). The judges had no other questions about the warrants. (*Id.* at 31.) The judges had never before rejected Officer Schlosser's warrants. (*Id.*) Although Officer Schlosser authored a separate warrant to search the seized iPhone and the ThinkPad, he was never able to obtain evidence from either device because they were password protected. (*Id.* at 15.)

Officer Schlosser described the incidents of March 2025 that resulted in the indictment now before this Court. On Facebook, Defendant had announced his intention to attend a city council meeting at the Dubuque Federal Building. Officer Schlosser testified Defendant, "entered the Dubuque building, along with his two dogs. He was dressed in a suit, draped in an American flag, with a marijuana cigarette in his ear." (*Id.* at 16.) Officers stopped Defendant before he entered the city council chambers where a meeting was in session. (*Id.*) Officer Schlosser understood Defendant had been "previously mentally committed." (*Id.*)

Defendant's Motion to Dismiss Exhibit A is the November 4, 2024 "Finding of Fact, Order Re: Involuntary Commitment and Order Re: Patient Advocate Per Iowa Code Sec. 229.3" entered by Magistrate Natalia Blaskovich of the First Judicial District of Iowa. This involuntary commitment order found Defendant to be suffering from a mental

illness and ordered he be involuntarily hospitalized for treatment. I note that the commitment order contained a notification that, pursuant to 18 U.S.C. Section 922(g)(4), Defendant was prohibited from possessing firearms and ammunition. (Def. Ex. A at 2.) Defendant's Exhibit B is the Physician's Report of Examination Pursuant to Iowa Code Section 229.10(2) that appears to have been filed in support of the application for Defendant's involuntary hospitalization.

## IV.    THE MOTION TO DISMISS

### A.    The Parties' Arguments

Defendant argues that Title 18 U.S.C. Section 922(g)(4) is unconstitutional on its face and as applied to him. Relying principally on *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) and its progeny, Defendant argues that Section 922(g)(4) is unconstitutional because it is not consistent with the America's "historic tradition of firearm regulation" and thus infringes on his Second Amendment rights. After arguing that the Second Amendment protects the conduct prohibited by Section 922(g)(4), Defendant addresses the historical analogues that might be marshaled in support of the prohibition and finds them wanting as to both "how" and "why" those historical prohibitions operated. Finally, Defendant argues Section 922(g)(4) is unconstitutional as applied to him. Largely, Defendant contends the Government must establish not only the allegation of mental illness, but that Defendant is also dangerous. Defendant then asserts reasons he believes he is not dangerous. Defendant also says that the process for restoration of rights pursuant to the Iowa Code does not make the deprivation of rights constitutional.

The Government replies that *Bruen* does not cast doubt on the constitutionality of statutes disarming the mentally ill. The Government then counters Defendant's historical analysis by pointing to the nation's longstanding tradition of disarming categories of dangerous persons, including those who have been determined to be mentally ill and

arguing Section 922(g)(4) is consistent with this tradition. After acknowledging that the Eighth Circuit has not yet addressed this subsection of Section 922(g), the Government then cites numerous district court decisions, including cases in this district, that support its conclusion.

Finally, the Government argues that the as-applied challenge is premature and must not be ruled upon without a trial on the merits. The Government includes its arguments regarding why, after such a trial, the Court should conclude Section 922(g)(4) is not unconstitutional as applied to Defendant.

**B.    *Analysis***

The facial challenge before me is identical to the one presented to the Court in *United States v. Clark*, No. 24-cr-2056 (N.D. Iowa April 8, 2025.) As in the case at bar, the defendant in *Clark* was alleged to have possessed a firearm[12] knowing he had previously been committed to a mental institution. In *Clark*, the defendant asserted the same challenges as Defendant herein. Chief Judge Williams reasoned as follows:

> Defendant first argues Section 922(g)(4) is unconstitutional on its face. (Doc. 23- 1, 3–9). He asserts that prohibiting a mentally ill person from possessing a firearm is inconsistent with the Nation's history and tradition of firearm regulation. *See* (*Id.*, at 7).
>
> The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II; *see also District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (recognizing that the Second Amendment confers "an individual right to keep and bear arms."); *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) (holding that the right to bear and keep arms is a fundamental right incorporated against the states by the Due Process Clause of the Fourteenth Amendment). A law may be facially unconstitutional if "no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also United States v. Veasley*, 98 F.4th 906, 909 (8th Cir. 2024). When analyzing a facial challenge to a firearm regulation specifically, "a court

---

[12] *Clark* involved multiple firearms.

must begin by asking whether the firearm regulation at issue governs conduct that falls within the plain text of the Second Amendment." *United States v. Sitladeen*, 64 F.4th 978, 985 (8th Cir. 2023) (citing *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17–18 (2022)). "If the regulation does govern such conduct, [a] court [shall] uphold it so long as the government can 'identify an American tradition justifying' the regulation." *Id*. (quoting *Bruen*, 597 U.S. at 38–39). Courts do not need to identify a "historical twin" to a modern regulation; rather, a "historical analogue" is sufficient. *Bruen*, 597 U.S. at 17, 30 (emphasis omitted).

As an initial matter, Section 922(g)(4) "governs conduct that falls within the plain text of the Second Amendment" because it regulates the people's right to possess firearms. *Sitladeen*, 64 F.4th at 985; *see United States v. Grubb*, 699 F. Supp. 747, 750–51 (N.D. Iowa 2023). The Second Amendment, however, does not specify who is included in "the people." *Grubb*, 699 F. Supp. at 751. Thus, if the "Nation's historical tradition of firearm regulation" provides a justification for regulating the possession of firearms by mentally ill individuals, Section 922(g)(4) must be upheld. *Bruen*, 597 U.S. at 17.

Section 922(g)(4) specifically prohibits any person "who has been committed to a mental institution" from possessing a firearm. 18 U.S.C. § 922(g)(4). The accompanying regulations promulgated by the Bureau of Alcohol Tabacco and Firearms and the Department of Justice define the term "committed to a mental institution" as

> A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. . . . The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

27 C.F.R. § 478.11. Although "[t]he issue of whether a person has been committed to a mental institution is a question of federal law . . .[,] it will almost always be the case that a prior commitment will have occurred pursuant to state law[.]" *United States v. Whiton*, 48 F.3d 356, 358 (8th Cir. 1995). Many states, including Iowa, require that a person pose a danger to himself or others in order to be involuntarily committed to a

mental institution. Iowa Code §§ 229.1, 229.13; *see*, *e.g.*, Kan Stat. Ann. §§ 59-2946(f), 2966 (2025); Minn. Stat. §§ 253B.02, 253B.09 (2024); Neb. Rev. Stat. §§ 71-908, 925 (2025); *see also Kansas v. Hendricks*, 521 U.S. 346, 358 (1997) ("We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'"). Put another way, Section 922(g)(4) prohibits a person from possessing a firearm if a court has determined that the person has a diagnosed mental illness and, as a result, poses a danger to himself or others.

Although the United States Supreme Court has not ruled on the constitutionality of Section 922(g)(4) specifically, the Court has held that "longstanding prohibitions on the possession of firearms by . . . the mentally ill" are "presumptively lawful." *Heller*, 554 U.S. at 626, 627 n.26. The Eighth Circuit Court of Appeals has not directly addressed the constitutionality of Section 922(g)(4) either. In *Veasley*, however, the Eighth Circuit analyzed this Nation's history of regulating a mentally ill person's ability to possess firearms. *See* 98 F.4th 906, 912–16 (2024) (addressing a facial challenge to Title 18, United States Code, Section 922(g)(3), which prohibits unlawful drug users from possessing firearms). In the late eighteenth century, those who were deemed both mentally ill and dangerous were confined in institutions and denied access to guns. *See id.* at 913–15 (citations omitted). Judicial proceedings before a justice of the peace were also required before a person could be confined involuntarily. *Id.* at 916. If a mentally ill person did not pose a danger to the community, he was allowed to stay at home with his family with "[his] civil liberties . . . intact." *Id.* at 913; *see also United States v. Cooper*, 127 F.4th 1092, 1095 (8th Cir. 2025). There were even mechanisms by which mentally ill individuals could regain their firearm rights when they no longer posed a danger to the community. *Compare Veasley*, 98 F.4th at 915 with Iowa Code § 724.31(2) ("A person who is subject to the disabilities imposed by 18 U.S.C. § [922(g)(4)] because of an order or judgment that occurred under the laws of this state may petition the court . . . for relief from the disabilities imposed under 18 U.S.C. § [922(g)(4)]."). These core regulatory principles have remained consistent throughout this Nation's history. *Id.* at 913. Because this Nation's historical tradition of disarming individuals who are both mentally ill and dangerous is sufficiently analogous to modern regulations, Section 922(g)(4) must be upheld under *Bruen*. Although non-dangerous persons with mental illnesses have

15

historically been allowed to maintain their firearm rights, this fact has no bearing on whether Section 922(g)(4) is facially constitutional.

Furthermore, there are many circumstances where Section 922(g)(4) would be constitutional because mental illnesses can manifest differently in each person. *See*, *e.g.*, Diagnostic and Statistical Manual of Mental Disorders 99–105 (Am. Psychiatry Ass'n ed., 5th ed. 2013) (explaining the diagnostic criteria for schizophrenia and the kinds of symptoms different patients may exhibit). As it did in the eighteenth century, whether a mentally ill person may lawfully possess firearms depends on the specific risk of danger he poses to himself or others. *See Veasley*, 98 F.4th at 912–16. This type of individualized assessment, however, is not required when addressing a facial challenge to a statute. *See id.* at 909. Because it is not impossible to imagine circumstances where it would be dangerous to allow a mentally ill person to possess a firearm, Section 922(g)(4) is also facially constitutional under the *Salerno* rule. *See* 481 U.S. at 745.

Thus, the Court denies defendant's facial challenge to Section 922(g)(4).

Having independently considered the merits of Defendant's challenge to Section 922(4)(g) and the case law he relies upon; I see no reason to reach a different conclusion than the Court in *Clark*. Thus, I recommend the Court deny defendant's facial challenge to Section 922(g)(4).

Defendant's as-applied challenge is also fated to the same conclusion as in *Clark* which states,

Federal Rule of Criminal Procedure 12(d) requires district courts to "decide every pretrial motion before trial unless it finds good cause to defer a ruling." Pretrial resolution may be appropriate "if the district court determines that it can decide the legal issues presented without making any factual findings." *United States v. Baxter*, 127 F.4th 1087, 1091 (8th Cir. 2025). But if ruling on an as-applied challenge requires "resolving factual issues related to [the] alleged offense," pretrial resolution "is likely improper before trial." *Id.*; *see also United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016) (quoting *United States v. Grimmett*, 150 F.3d 958, 962 (8th Cir. 1998)). Here, there are factual issues related to the elements of the offense that must be resolved by the fact-finder. Because those issues

may not be resolved before trial, the Court cannot yet rule on defendant's as-applied challenge.

Thus, I recommend that the Court hold in abeyance Defendant's as-applied challenge.

## V. THE MOTION TO SUPPRESS

### A. Stipulation

While not formally titled a "stipulation," the parties have come to an agreement limiting the necessary scope of the Court's ruling on the motion to suppress. The Government asserted:

> The government has conferred with counsel and confirmed this relates only to evidence seized pursuant to warrants issued on October 31, 2024, and November 1, 2024, and not to the firearm and other evidence seized on March 3, 2025, resulting in the charged offense. As noted in defense Exhibit E-1, no evidence was obtained from the Apple iPhone or Lenovo Thinkpad. The government will not be seeking to admit either the Apple iPhone or the Lenovo Thinkpad or the extraction of those devices' data and content and the review of that data, so the Court need not rule on their admissibility. This leaves the admission of "[f]irearms, magazines, ammunition, documents related to firearms and ammunition, controlled substances, paraphernalia, photographs taken by police, and observations of officers" taken by the officers from defendant's residence on October 31, 2024.

(Doc. 42 at 2, Hr'g Tr. at 1-3.) In other words, the Government obtained no evidence from Defendant's cell phone or his Lenovo Thinkpad which are the subject of the first and fourth warrants and that the Government will not be offering the contents of these devices at trial. This moots Defendant's argument that the warrant for the search of the phone was insufficiently particular. (Doc. 39-1 at 10, Hr'g Tr. at 4.) This also appears to largely moot any arguments about all the warrants except the warrant to search for controlled substances, firearms, and ammunition, i.e., the third warrant. (Gov. Ex. 3.) I say the arguments are "largely" mooted because the warrants are somewhat cumulative, and the third warrant clearly piggybacks on the information gleaned from execution of

17

the warrant for the initial search of Defendant's residence. Moreover, Defendant's *Leon* argument appears to relate to the procedures for drafting, obtaining, and executing the whole series of warrants. For these reasons, consideration of certain circumstances surrounding all the warrants may be necessary.

## B. The Parties' Arguments

Defendant argues that the warrants are not supported by probable cause. Defendant asserts that the applications to seize Defendant's cell phone and search his residence do not explain why law enforcement believed evidence might be found there. More particularly, Defendant alleges that the affidavit does not (a) explain who was being harassed or how, other than in a conclusory manner, (b) connect the alleged harassment to activity at Defendant's residence, and (c) provide a basis to conclude any electronic devices that were capable of "communicat[ing] via cell service or Wi-Fi" would be located at the residence. Defendant asserts that the "the first search warrant application provided no explanation for why Goodman's cell phone or any electronics might contain evidence of a crime." (Doc. 39-1 at 7.)[13] Similarly, Defendant claims that the affidavit for the second warrant fails to explain why law enforcement expected to find evidence of harassment (which he believes was inadequately described) or evidence of trespass.

Regarding the third warrant, Defendant argues that it did not allege with particularity any crime relating to the observed firearms. Defendant does not take issue with the conclusion that the items seized were in plain view during the execution of the second warrant. Defendant's principal argument is that the third warrant is fruit of the poisonous tree, that is, the product of the entry into the residence to execute the second warrant.

---

[13] While the contents of the phone are no longer at issue, Officer Schlosser's efforts to locate phones and other electronic devices led to the search of Defendant's residence and the discovery of evidence or firearms and controlled substances that were in plain view.

As stated above, Defendant's argument regarding the particularity of the warrant for the search of the phone and laptop is moot. Defendant finally argues that the *Leon* good faith exception does not apply.

The Government contends that the four corners of the warrants supply probable cause for the search. The Government cites the existence of "a multitude of links between defendant and criminal activity and harassment of C.M." (Doc. 42-1 at 9.) The Government notes evidence that Defendant appears to have delivered or arranged for the delivery of a letter to multiple properties from which he had been "trespassed." The Government notes Defendant's previous access to the printer at Defendant's business, the fact that Defendant's letter was printed there more than 50 times, and his presence in the area when C.M.'s network was accessed. Moreover, the Government notes Defendant's use of Facebook and text messages to communicate about C.M. Finally, the Government argues that even if the warrants are not supported by probable cause, the *Leon* good faith exception applies.

## C.    *Relevant Law*

"The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached magistrate, (2) contain a 'particular[ ] descri[ption of] the place to be searched, and the persons or things to be seized,' and (3) be based 'upon probable cause, supported by Oath or affirmation.'" *United States v. Skarda*, 845 F.3d 370, 375 (8th Cir. 2016) (quoting *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994), in turn quoting U.S. Const. amend. IV). "A magistrate judge may issue a search warrant 'upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place.'" *Skarda*, 845 F.3d at 376 (quoting *Steagald v. United States*, 451 U.S. 204, 213, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)). "Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v.*

*Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 238 (1983)); *see also United States v. Evans*, 4 F.4th 633, 636 (8th Cir. 2021) ("Probable cause is a fair probability that . . . evidence of a crime will be found in the location to be searched") (quoting *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996))). "In assessing whether a warrant is sufficiently particular, [courts] consider the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *United States v. Ivey*, 91 F.4th 915, 918 (8th Cir. 2024) (citation omitted). The particularity requirement "is one of 'practical accuracy rather than a hypertechnical one.'" *Id*. (quoting *United States v. Schave*, 55 F.4th 671, 675 (8th Cir. 2022)). "Common sense" drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "'[T]his practical and common-sensical standard' is based on 'the totality of the circumstances.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

It is not this Court's place to determine whether affidavits supporting search warrants are supported by probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (citation and internal quotation marks omitted); *see also United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) ("In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of probable cause."). "The Fourth Amendment requires that the issuing 'magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *United States v. Maccani*, 49 F.4th 1126, 1130 (8th Cir. 2022) (quoting *Gates*, 462 U.S. at 236); *see also United States v. Johnson*, 848 F.3d 872, 876 (8th Cir. 2017) ("The role of a

reviewing court is to ensure the magistrate issuing the warrant 'had a "substantial basis for concluding that probable cause existed"'") (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016), in turn quoting *United States v. Garcia-Hernandez*, 682 F.3d 767, 771 (8th Cir. 2012))). "When the issuing magistrate relies solely on a supporting affidavit in determining probable cause, . . . 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Saddler*, 19 F.4th 1035, 1039 (8th Cir. 2021) (quoting *United States v. Roberts*, 975 F.3d 709, 713 (8th Cir. 2020)). "The issuing court's probable cause determination 'should be paid great deference by reviewing courts.'" *Johnson*, 848 F.3d at 876 (quoting *United States v. Brewer*, 588 F.3d 1165, 1170 (8th Cir. 2009)).

The substantial basis standard requires that the issuing judge "make a practical and common-sense" determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986) (quoting *Gates*, 462 U.S. at 238). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, . . . law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)). "[T]here is no requirement that an affiant have first-hand knowledge of every allegation he includes in his affidavit." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011). Conclusory statements, however, "made by affiants fail to give the issuing magistrate a substantial basis for determining probable cause exists." *United States v. Summage*, 481 F.3d 1075, 1077-78 (8th Cir. 2007). "In addition to probable cause that contraband or evidence of a crime will be found, 'there

must [also] be evidence of a nexus between the contraband and the place to be searched.'" *United States v. Randle*, 39 F.4th 533, 536 (8th Cir. 2022) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). This requires "'a "nexus" between the evidence to be seized and the place to be searched, considering "the nature of the crime and the reasonable, logical likelihood of finding useful evidence."'" *Schave*, 55 F.4th at 676 (quoting *United States v. Smith*, 21 F.4th 510, 515 (8th Cir. 2021), in turn quoting *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017)).

Defendant bears the burden of proving the warrant was issued without probable cause. *See Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence") (citing *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)); *United States v. McGuire*, No. CR 13-40058, 2013 WL 5516192, at *3 (D.S.D. Oct. 1, 2013) ("A movant seeking to suppress evidence under a regularly issued warrant has the burden to show that the warrant was issued without probable cause") (quoting *United States v. Sierra–Garcia,* 760 F. Supp. 252, 262 (E.D.N.Y. 1991)), *R. & R. adopted,* 2013 WL 6449893 (D.S.D. Dec. 10, 2013). "In doubtful or marginal cases, the resolution of the Fourth Amendment question should be determined to a large extent by the preference accorded to searches based upon warrants." *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982) (quoting *United States v. Christenson*, 549 F.2d 53, 55 (8th Cir. 1977)); *see also United States v. Ventresca*, 380 U.S. 102, 109 (1965) ("Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.").

*D.*     *Analysis*

*1.*     ***Was there probable cause for the first warrant to seize Defendant's
        phone?***

While this aspect of the motion may be moot because law enforcement was not
able to search the phone or obtain any evidence from it, I will nevertheless address it.
The crux of Defendant's argument is that the affidavit fails to explain why there might
be evidence on the phone.  (Doc. 39-1 at 2, 3.)

The application expressly requested permission to search Defendant's person for
his "cell phone."  Officer Schlosser checked that the cell phone "is property used or
possessed with the intent to be used as a means of committing a public offense or
concealed to prevent an offense from being discovered" and "property relevant and
material as evidence in a criminal prosecution."  In summary, the affidavit sets forth the
following:

  a. Law enforcement's initial meeting with the alleged victim C.M. on
     October 28, 2024;

  b. C.M.'s complaint of ongoing harassment by Defendant;

  c. C.M was able to positively identify Defendant as a person who had
     worked at C.M.'s business until Defendant was fired the previous
     month;

  d. C.M. had learned of a letter created by Defendant "regarding a
     lawsuit attacking [C.M.] and his business";

  e. From October 26 to October 27, 2024 (i.e., a few days before the
     warrant was issued), Defendant had given these letters to people;

  f. The letters had been found at nine of C.M.'s properties (and one
     property belonging to C.M.'s wife's) from which Defendant had
     been trespassed;

23

g.  C.M. found approximately 50 copies of the same letter on his printer and C.M. believes accessed the printer using Wi-Fi;

h.  C.M. learned from his employees that Defendant had driven by his business and yelled "Fuck [C.M.]" on October 28, 2024. Law enforcement confirmed Defendant's vehicle at this time and location with traffic camera footage;

i.  C.M. showed law enforcement a text Defendant sent to a third party stating, "'[C.M.] is going to have to deal with the consequences of his actions.' Goodman talks about [C.M.] making millions from a deal Goodman allegedly got him. [D.L.] asked Goodman 'Whats the goal? Settlement or burn it down?' Goodman responded with fire emojis and money bag emojis. Then states, 'House on fire' and 'I expect a settlement, but that's not what it's about.'" It is reasonable to infer that a "text" comes from a phone or other electronic device.

j.  C.M. also showed law enforcement a Facebook post, among others, by Defendant that he believed was directed at him, "You forced the hand, now you can deal with the consequences." It is reasonable to infer that a Facebook post comes from a phone or other electronic device.

k.  C.M. showed law enforcement from a third party wherein Defendant states, "he wants to 'destroy [C.M.]' and that he will 'Own everything when it's over.'"

l.  C.M.'s IT person told law enforcement that he had investigated network logins and found a "new laptop" added to the network on October 27, 2024 at 6:17 p.m. and disconnect at 6:24 p.m. Law enforcement confirmed Defendant's presence near C.M.'s office at

24

this time and location. During this same time, an iPhone was also connected to the network. The same iPhone had previously connected on October 12, 2024. Although the IT person stated that Defendant's access had been revoked, he believed Defendant could nevertheless access the printer via Wi-Fi.

Defendant is correct that Officer Schlosser's affidavit never declares, "I believe Defendant may have used his phone as part of his campaign of harassment of C.M., including remotely accessing C.M.'s network, sending messages as part of the harassment and/or posting messages related to the harassment." Nevertheless, it would take an inordinately obtuse reading of the application to avoid drawing the inference that Defendant was suspected of using his iPhone in this manner.

Obviously, the affidavit need not establish Defendant's guilt beyond a reasonable doubt, only probable cause to believe evidence of a crime would be present on Defendant's cell phone. I recommend that the Court conclude that the affidavit contains a substantial basis for the issuing judge to conclude that a search would uncover evidence of wrongdoing. First, C.M.'s statements to law enforcement showed reason to believe that Defendant was a disgruntled former employee with both a motive and opportunity to harass C.M. Moreover, the affidavit showed Defendant was, in fact, hostile to C.M. For example, the affidavit shows Defendant yelling "Fuck [C.M.]" to C.M.'s employees, potentially accessing properties he was banned from, and making threatening

statements.[14]   Defendant's phone (whether an iPhone or not[15]) could reasonably be expected to contain evidence of Facebook posts or texts to third parties that are included in the affidavit.   It could also reasonably be inferred that investigation of any iPhone seized from Defendant may match the one C.M.'s IT person had identified as accessing the network.

---

[14] It might be tempting to speculate about whether statements attributed to Defendant such as "burn it down," "house on fire" or "destroy [C.M.]" are subject to criminal sanction.  Iowa Code Section 708.7 defines various types of harassment.  I don't intend to delve into the issue. Nevertheless, these statements bear enough hallmarks of hostility to make them relevant to the investigation into Defendant's possible motive and involvement in the alleged harassment.  Even if the alleged harassment is not itself criminally actionable, evidence Defendant entered onto property as part of the harassment campaign may be relevant to the crime of trespass which includes:

> Entering or remaining upon or in property without justification after being notified or requested to abstain from entering or to remove or vacate therefrom by the owner, lessee, or person in lawful possession, or the agent or employee of the owner, lessee, or person in lawful possession, or by any peace officer, magistrate, or public employee whose duty it is to supervise the use or maintenance of the property. A person has been notified or requested to abstain from entering or remaining upon or in property within the meaning of this subparagraph (2) if any of the following is applicable:
>
> (a) The person has been notified to abstain from entering or remaining upon or in property personally, either orally or in writing, including by a valid court order under chapter 236.

Iowa Code § 716.7(2)(a)(2).

[15] The defense's cross-examination of Officer Schlosser was critical that the affidavit did not specify the seizure of an "iPhone" or even an "iPhone 15," which C.M.'s IT person believed had accessed the network.   As Officer Schlosser stated, at the time of the seizure, law enforcement did not know what kind of cell phone Defendant owned or whether he owned more than one.  Certainly, an iPhone 15 would be most consistent with the conclusion that Defendant had accessed C.M.'s network.  However, any phone might have contained other sorts of evidence about the harassment.

The supporting affidavit is not perfect. Perhaps it leaves the reader to make connections by inference that could have been detailed more specifically. A practical reading of the affidavit, considering the totality of the circumstances, however, makes clear the nature of what is being sought and why. First, it is not surprising or alarming in 2025 that a judge reviewing a search warrant would infer that the purpose of seizing Defendant's phone is to ultimately search it for evidence of criminal trespass or harassment. Judges "may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant." *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir.2000). Nor is it troubling that the affidavit does not separately delineate what evidence law enforcement anticipates discovering when it is reasonably clear from the context of the application.

Second, the warrant application does not expressly state that either the cell phone itself (perhaps its make and model number) or its contents would reveal evidence of Defendant's presence at C.M.'s place of business. A decade (or more) ago, the failure to spell out the evidentiary value of placing the cell phone at a particular location might have been a more glaring omission. In October 2024, the absence of such an explanation is less troubling. Here, the affidavit contains the explanation of C.M.'s IT person that an iPhone 15 and a laptop connected to C.M.'s network within the few minutes that Defendant was in the area. The affidavit stated that "the same iPhone" connected earlier the same month. From this, it is not difficult to deduce that C.M.'s IT person is able to identify the specific device that was used to access the network. If it turned out that Defendant (who had been driving by and hollering at employees and was involved in a letter-writing campaign against his former employer) had entered onto C.M.'s property to access his Wi-Fi and print letters that were found on other properties from which he had been trespassed, the phones presence at this time and location would be a significant evidentiary discovery for a trespass prosecution.

Again, the affidavit could have been improved with explicit explanations of the "how" and "why." But I do not fault an experienced judge for making the inferences necessary to find probable cause for this warrant. At some point in our receding technological past, it might have been necessary for a law enforcement officer to explain to a judge that a "telephone" is an electrical instrument for simultaneously transmitting and receiving audible signals, principally to facilitate voice communication over long distances. That detail is obviously no longer required in a routine warrant that talks about telephonic communication. Now, I suggest, some detailed explanations of other technological items referred to in Officer Schlosser's affidavit such as "texts," "printer," "Wi-Fi," and "laptop" are not invariably necessary. Certainly, there may be aspects of how, for example, "Wi-Fi" networks generate evidence that require more detailed explanation. While a judge might have refused the instant warrant for not better spelling out how seizing the phone would be "relevant and material as evidence in a criminal prosecution," I recommend the Court decline the invitation to substitute its judgment for the issuing judge under the totality of the circumstances presented.

Based on the totality of the circumstances outlined above, and paying great deference to the issuing court's probable cause determination in the search warrant, I find that the issuing judge had a substantial basis for concluding that probable cause existed and that there was a fair probability that contraband or evidence of a crime would be found on the cell phone or that the cell itself would be evidentiary. *See Reed*, 921 F.3d at 757; *Johnson*, 848 F.3d at 876; *Kail*, 804 F.2d at 444. I also find that the requisite "nexus" between the evidence to be seized and the place to be searched was established in the search warrant. *See Schave*, 55 F.4th at 676. Thus, I find that there was probable cause for the initial October 31, 2024 search warrant, Government's Exhibit 1. Accordingly, I recommend that the motion to suppress the first warrant be denied.

**2. Was there probable cause for the second warrant to search Defendant's home for electronic devices?**

The application for a warrant to search Defendant's residence (Gov't Ex. 2) is almost identical to the application in support of the first warrant. The only difference is that instead of seeking a warrant to search Defendant's person to seize his phone, law enforcement sought permission to search his residence for "Any electronic devices that can communicate via cell service or internet and or Wi-Fi.. (a search warrant to forensically examine the items will be sought later.)" (Gov't Ex. 2). Both warrants were signed by Judge Richter on October 31, 2024. The second warrant was issued shortly after the first and after Defendant's cell phone was seized at the hospital. However, the warrant application does not mention this circumstance. The application does not say, for example, "I executed the first warrant by seizing Defendant's cell phone, an iPhone, at the hospital, but I did not note the presence of a laptop or other electronic devices in Defendant's possession. In my training and experience, people store laptops, cell phones and other internet capable electronic devices in their residence."

For the reasons outlined in the immediately preceding section, I believe there was substantial evidence to conclude a laptop would contain evidence of a crime. The laptop was in mentioned in the affidavit as having connected to C.M.'s network at the time Defendant was near C.M.s place of business. Moreover, other electronic devices could have been used to make posts or texts relevant to the harassment investigation. The absence of an expressed nexus between the laptop and Defendant's residence is more troubling. Here, again, I would defer to the issuing judge's ability to draw a reasonable inference about where the laptop or other electronic devices were likely to be found. This is not a case where a judge is being asked to infer, for example, that a drug dealer stores quantities of drugs for later distribution at his residence. Rather, the inference is simply that a reasonable place to look for familiar, useful, valuable, objects such as a laptop or

other devices, is in someone's residence. Here, the affidavit creates the impression that the campaign against C.M. was personal in nature. There is no hint that some other business entity was involved and, thus, no reason to suspect the items sought might be at some commercial property. Similarly, there was no reason to suspect Defendant had a place of business or storage locker where he might keep these devices. Thus, I would again conclude that there was a substantial basis to find probable cause existed to search the residence for the requested devices.

### 3. Was there probable cause for the third warrant (*i.e.*, to search Defendant's home for controlled substances, paraphernalia, firearms, and ammunition)?

Defendant argues that the third warrant did not allege with particularity any crime related to the observed firearms. Here, again, Officer Schlosser's affidavit is not a model of precision or completeness. It does include the statements:

> [C.M.] is afraid because he knows Goodman owns firearms, uses drugs and is not mentally stable.

> On 10/31/2024 Dubuque Police were executing a search warrant at Goodman's residence. When police entered the residence, they could detect an odor of marijuana. Upon initial search of the residence, located in plain view was marijuana, firearms, and drug paraphernalia.

(Gov't Ex. 3.) I recommend the Court defer to the issuing judge's determination that the crime or crimes being investigated are reasonably inferred from the affidavit. Obviously, possession of a marijuana is a crime under federal law. Additionally, the circumstances cited in the supporting affidavit made it reasonable for law enforcement to investigate the crimes of possession of a firearm by a drug user under 18 U.S.C. Section 922(g)(3).

30

Defendant's other argument regarding the third warrant is that it was fruit of the poisonous tree. In other words, because the warrant to search his residence for electronic devices lacked probable cause, law enforcement had no legitimate reason to be present to detect the odor of marijuana, as well as see marijuana, firearms, and drug paraphernalia. Because I have recommended that the Court find a substantial basis to support probable cause for the second warrant, I also recommend the Court conclude there is no poisonous tree and, therefore, the product of the third warrant is untainted. However, should the Court disagree with my conclusion regarding the second warrant, I recommend it suppress the products of the search shown in pages 3-4 of Defendant's inventory. (Doc. 39-2).

### 4. Was there probable cause for the fourth warrant (i.e., to search Defendant's electronic devices)?

This aspect of Defendant's motion should be ruled moot because law enforcement was unable to access the devices and the Government does not intend to offer evidence of their contents at trial.

### 5. Is the Leon good faith exception applicable?

Alternatively, if the Court determines that the initial October 31, 2024 search warrant lacked probable cause, the *Leon* good faith exception should be applied in this matter.

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well-trained officer would have known that the search was

illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id*. at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id*. at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, [law enforcement's] prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d

663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Cannon*, 127 F.3d at 413.

None of the four scenarios contemplated by *Leon* apply here. There is no evidence that the affidavit in support of the search warrant contained any false statements or that the issuing magistrate judge was misled in any way. There is no evidence that the issuing magistrate judge "wholly abandoned" his or her judicial role in issuing the search warrant. As discussed above, based on the affidavit in support of the warrant application, the issuing judge had a substantial basis and made "a practical and common-sense" determination, based on the totality of the circumstances, that "a search would uncover evidence of wrongdoing"; and therefore, the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See Kail*, 804 F.2d at 444; *Maccani*, 49 F.4th at 1130; *Proell*, 485 F.3d at 431. Finally, there is no allegation or evidence that the warrant is "so facially deficient" that a police officer could not reasonably presume that the warrant was valid. Thus, I find that law enforcement's conduct was close enough to the line of validity to justify law enforcement's belief that the search warrant was objectively reasonable. *See id*. Accordingly, as an alternative, I recommend that Defendant's motion to suppress be denied under the *Leon* good faith exception.

## VI. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Dismiss **(Doc. 35)** and **deny** Defendant's Motion to Suppress **(Doc. 39)**.

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the

parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 9th day of January, 2026.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa